644 A.2d 1098

THE PAUL REVERE LIFE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. GILBERT K. HAAS, DEFENDANT–RESPONDENT.

Argued March 15, 1994—Decided July 26, 1994.

*Robert Wright* argued the cause for appellant (*Melli & Wright,* attorneys; *Wright* and *Cynthia Dokas,* on the brief).

*Brian T. Campion* argued the cause for respondent (*Herten, Burstein, Sheridan & Cevasco,* attorneys).

*Theodore D. Aden* submitted a brief on behalf of *amicus curiae* American Council of Life Insurance (*LeBoeuf, Lamb, Greene & MacRae,* attorneys; *Aden* and *Rita M. Theisen,* a member of the District of Columbia bar, on the brief).

*Douglas F. Johnson* and *Kathryn R. Renahan* submitted a brief on behalf of *amicus curiae* Health Insurance Association of America (*Earp, Cohn, Leone & Pendery,* attorneys; *Thomas B. Ackland, Gail E. Cohen* and *Monica A. Fisher,* members of the California bar, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

We granted the petition for certification of plaintiff, The Paul Revere Life Insurance Co. (plaintiff, the insurer, or Paul Revere), 137 *N.J.* 307, 645 *A.*2d 136 (1993), to determine whether a statutorily-mandated "incontestability clause" included in a disability policy precludes the insurer from denying a claim when the insured intentionally failed to disclose a disabling disease in the insurance application. We hold that an insured may not recover under a disability insurance policy for a disease that he or she intentionally concealed when applying for the policy.

–I–

This appeal arises from the motion of defendant, Gilbert Haas (defendant, the insured, or Haas), for summary judgment dismissing Paul Revere's complaint. The complaint alternatively sought rescission of the policy or a declaratory judgment that the policy does not cover Haas's claim. Because the matter arises on the insured's motion for summary judgment, we consider the facts in the light most favorable to the insurer. *See Maher v. New Jersey Transit Rail Operations, Inc.*, 125 *N.J.* 455, 477, 593 *A.*2d 750 (1991) (stating that on motion for summary judgment, court draws all reasonable inferences in favor of non-moving party). For the purpose of this motion, Haas admits that when he applied for disability insurance he knew he was suffering from retinitis pigmentosa, a progressive disease of the eyes that leads to blindness. He also admits that he intentionally concealed that information from the insurer.

On January 20, 1987, Haas applied to Paul Revere for disability insurance. When answering questions in the application, Haas stated that he had not been examined by or consulted a physician in the last five years, and that he had never had any known indication of, or been treated for, any disease or impairment of his eyes. In response to a question asking whether he had had "any surgical operation, treatment, special diet, or any illness, ailment,

abnormality, or injury, not mentioned above, within the past five years," he again answered in the negative.

His answers were false. In fact, Haas had been evaluated, beginning on October 20, 1983, in the New York University Retinal Clinic. As early as 1984, his doctors had told him that he had retinitis pigmentosa. Further, Haas had also been treated for the disease in 1985.

Relying on Haas's false statements in the application, Paul Revere issued the policy on March 5, 1987. The policy contained the following clauses:

10.2 **INCONTESTABLE**

a. After Your Policy has been in force for two years, excluding any time you are disabled, we cannot contest the statements in the application.

b. No claim for loss incurred or disability beginning after two years from the Date of Issue will be reduced or denied because a disease or physical condition existed before the Date of Issue unless it is excluded by name or specific description.

On December 1, 1990, Haas notified Paul Revere that he intended to file a claim. On January 7, 1991, he executed a proof of claim, stating that as of December 1, 1990, he had become totally disabled because of retinitis pigmentosa.

Paul Revere's investigation of the claim uncovered that Haas had lied in his application. On October 17, 1991, Paul Revere filed its complaint. The Law Division granted Haas's motion for summary judgment and dismissed the complaint. The Appellate Division affirmed in part and reversed in part, holding that, although the incontestability clause precluded Paul Revere's defenses after two years, an issue of fact existed whether Haas had been disabled during the two-year incontestability period. 266 *N.J.Super.* 35, 44–45, 628 *A.2d* 772 (1993). Under the policy, the effect of such a disability would be to toll the contestability period. *Id.* at 45, 628 *A.2d* 772. Consequently, the Appellate Division remanded the matter to the Law Division.

Initially, this case concerns the interpretation of the terms of a disability insurance policy. Ultimately, however, it involves a policy choice concerning the effect of an insured's concealment of a

disability in an application for insurance on a subsequent claim for the concealed disability. After a stated period, an incontestability clause grants an insured repose from the rescission of the policy because of misstatements in the application. The clause, however, neither expands the coverage provided by the policy nor prevents the insurer from defending against a claim based on a disease that the insured knowingly concealed when applying for insurance. Accordingly, we reverse the judgment of the Appellate Division to the extent that it precludes Paul Revere from denying coverage of Haas's claim for retinitis pigmentosa, and we remand to the Law Division.

–II–

Coloring our perception of the subject incontestability clause is the history and purpose of such clauses. At the end of the nineteenth century, life insurance companies introduced incontestability clauses to dispel the public's fear that insurers would not honor claims if the insured had made a technical mistake in the application. *See Powell v. Phoenix Mut. Life Ins. Co.*, 313 *Ill.* 161, 144 *N.E.* 825, 826–27 (1924) (listing cases involving such clauses); 7 *Williston on Contracts* § 912 (Jaeger ed. 1963) (*Williston*) (stating that insurance companies resisted liability because of misstatements made by insureds). By the early twentieth century, many states had passed statutes mandating that certain insurance policies be incontestable. *Williston, supra*, § 912 at 395; *see also Wischmeyer v. Paul Revere Life Ins. Co.*, 725 *F.Supp.* 995, 1000 (S.D.Ind.1989) (discussing history and rationale behind clauses). The clauses are unquestionably for "the benefit of the insured." 1A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 311 at 321 (1981) (Appleman). Their purpose is " 'to give the insured a sense of security after the stated period elapses.' " *Strawbridge v. New York Life Ins. Co.*, 504 *F.Supp.* 824, 829 (D.N.J.1980) (quoting *Johnson v. Metropolitan Life Ins. Co.*, 53 *N.J.* 423, 442, 251 *A.2d* 257 (1969)).

A leading treatise on insurance law describes the public policies underlying the incontestability clauses:

> [T]here are conflicting forces of public policy which affect the matter of contestability. If an applicant chooses to gamble when he seeks a policy of life insurance, he may be guilty of outrageous fraud, and if the insurer fails to uncover such fraud within the contestable period he has been successful. Even if he makes such discovery in time, he receives back his premiums so that he has suffered no loss. On the other hand, only a minuscule percentage of the population ever resorts to such devious conduct, and it is considered desirable to have a cutoff time as to ordinary misrepresentations for two reasons: first, to lighten the burden upon the courts, since litigation otherwise could be increased manyfold; second, since most contests would arise after the insured's death, a beneficiary is in a deplorable condition to wage battle with a large insurer over statements which may have been made years earlier. For these reasons, it is better to countenance the occasional risk of fraud in order to bring an end to controversy.

> [Appleman, *supra*, § 311 at 305–06.]

## –III–

 The New Jersey Legislature addressed these policy considerations by enacting *N.J.S.A.* 17B:26–5, which requires an incontestability clause in all health-insurance contracts. *N.J.S.A.* 17B:26–5 gives an insurer a choice of provisions. It states:

> There shall be a provision as follows:

> Time limit on certain defenses:

> a. After 2 years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such 2–year period.

> \* \* \* \*

> (2) A policy \* \* \* [such as the one issued by Paul Revere] may contain in lieu of the foregoing the following provision (from which the clause in parentheses may be omitted at the insurer's option) under the caption "INCONTESTABLE":

> After this policy has been in force for a period of 2 years during the lifetime of the insured, (excluding any period during which the insured is disabled) it shall become incontestable as to the statements contained in the application.

> b. No claim for loss incurred or disability (as defined in the policy) commencing after 2 years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss and existed prior to the effective date of coverage of this policy.

■ Thus, the statute gave Paul Revere the option of inserting in its policy a provision that would have excluded fraudulent misstatements from the protection of the incontestability clause. Such a provision would have allowed Paul Revere to void the policy for a fraudulent misstatement. *Johnson, supra,* 53 *N.J.* at 440–41, 251 *A.2d* 257; *Metropolitan Life Ins. Co. v. Lodzinski,* 122 *N.J.Eq.* 404, 408–09, 194 *A.* 79 (E. & A.1937). Paul Revere chose, instead, for section 10.2a of its policy, a provision that tolled the incontestability clause for "any period during which the insured is disabled." Each of the optional statutory clauses provides certain benefits to the insurer, which must choose between a clause protecting it from fraudulent misstatements and one extending the incontestability period if the insured becomes disabled during that period. Whichever clause it chose, Paul Revere was also required to use the language adopted in section 10.2b.

–IV–

■ "Generally, an insurance policy should be interpreted according to its plain and ordinary meaning." *Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.2d* 1255 (1992). "[B]ecause insurance policies are adhesion contracts, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Ibid.* As a consequence, "[w]hen the meaning of a phrase is ambiguous, the ambiguity is resolved in favor of the insured, and in line with an insured's objectively-reasonable expectations." *Ibid.* (citation omitted). When terms in an insurance policy are included by statutory mandate, however, courts no longer construe the policy against the insurer; rather, the ordinary rules of statutory construction apply. *See Wischmeyer, supra,* 725 *F.Supp.* at 1001 (holding that court will apply "plain and ordinary meaning" of clause where language required by statute). In sum, "an incontestability clause required by statute cannot be construed against the insurer." Appleman, *supra,* § 332 at 384.

Before us, Paul Revere makes three points. First, it claims that although the incontestability clause bars rescission, the clause does not prevent Paul Revere from denying benefits due to lack of coverage. Second, it contends that the policy excludes by specific reference Haas's condition, and therefore that he is not covered. Third, it argues that the incontestability clause precludes defenses only against conditions that existed but were not manifested at the time of the application. Claims that the insured knew existed, Paul Revere argues, fall outside the incontestability clause.

–A–

We first consider Paul Revere's claim that the incontestability clause does not prevent it from denying coverage. Our analysis starts with the terms of section 10.2a, which states that after the policy "has been in force for two years, ... [w]e cannot contest the statements in the application."

Haas contends that in addition to preventing rescission, section 10.2b also prohibits Paul Revere from defending against his claim. He relies on *Johnson, supra,* 53 *N.J.* at 439, 251 *A.*2d 257 in which we held that the insurer could not raise the defense of equitable fraud to bar the claim when an incontestability clause prohibited rescission. In *Johnson,* the insured became disabled, and ultimately died, from Alzheimer's disease. *Id.* at 427, 251 *A.*2d 257. The insurer denied coverage because the insured had failed to disclose that his physicians had stated that he possibly suffered from a heart condition. *Id.* at 428–31, 251 *A.*2d 257. The insurer suggested that

a distinction be drawn between voiding the policy and denying a claim, so that even if the insurer could not void the policy after two years except for "fraudulent" misstatements, it could nonetheless defend at any time against a claim for disability which arose within the two-year period on the basis of misstatements although not "fraudulent." This distinction will not withstand analysis.

The fallacy in the insurer's suggestion lies in the assumption there is a difference between *voiding the policy* and *denying a claim* under it. There can be no such distinction when the fraud relied upon reposes *in the making of the contract.*

[*Id.* at 439–40, 251 *A.*2d 257.]

Thus, Johnson suggests that the incontestability clause in section 10.2a prohibits both rescission of the policy and a denial of claims on the basis of fraud.

*Johnson*, however, is distinguishable from the present case. In *Johnson*, the alleged fraud did not directly relate to the claim for which the insurer denied coverage. Hence, the insurer's denial of the claim was tantamount to rescission of the entire policy. Denial of the claim stemmed not from fraud peculiar to the claim itself, but from fraud in the application. In contrast, Paul Revere seeks to deny a claim on the basis of fraud relating only to that claim. Denial of that claim does not constitute rescission of the policy. Thus, *Johnson* does not control the outcome of this case.

Most courts have read the language in section 10.2a, or similar language, to prohibit only rescission of the policy, not denial of a specific claim. See *Keaten v. Paul Revere Life Insurance Co.*, 648 *F*.2d 299, 301 (5th Cir. Unit B 1981) (providing under Georgia law, after contestability period has run, insurer may not contest validity of policy itself, but "reserves the right to deny any claim if it is not within the coverage as stated under the policy's terms"); *Massachusetts Casualty Insurance Co. v. Forman*, 516 *F*.2d 425, 428 (5th Cir.1975) (applying Florida law and holding incontestability clauses do not cut off defenses relating to coverage), *cert. denied*, 424 *U.S.* 914, 96 *S.Ct.* 1114, 47 *L.Ed.*2d 319 (1976); *Home Life Insurance Co. v. Regueira*, 313 *So.*2d 438, 439 (Fla.Dist.Ct. App.1975) (holding that incontestability clauses prohibit challenges to validity of policy but not defenses relating to limitation of coverage), *cert. denied*, 328 *So.*2d 844 (Fla.1976); *Carlson v. New York Life Insurance Co.*, 76 *Ill.App.*2d 187, 222 *N.E.*2d 363, 371 (1966) (noting that clause prohibits insurer from defending on grounds of invalidity, but allows contests involving scope of coverage); *Metropolitan Life Insurance Co. v. Conway*, 252 *N.Y.* 449, 169 *N.E.* 642, 642 (1930) (Cardozo, C.J.) (holding that incontestability clause precludes defense of invalidity of policy but not denial of coverage on claim); *Minnesota Mut. Life Insurance Co. v. Morse*, 487 *S.W.*2d 317, 319–20 (Tex.1972) (stating that policy is

valid after expiration of contestability period but insurer may still dispute whether claim covered); *see also Golden v. Northwestern Mutual Life Insurance Co.,* 229 *N.J.Super.* 405, 413–14, 551 *A.*2d 1009 (App.Div.1988) (noting that "an action for rescission based on equitable fraud must be commenced prior to the incontestability clause in the policy taking effect as mandated by *N.J.S.A.* 17B:25–4").

We find the majority rule persuasive. As Appleman points out, the "better rule is clearly that the incontestability clause relates only to the validity of the contract, and should not affect in any way whatsoever the construction of the terms thereof." Appleman, *supra,* § 331 at 372. Accordingly, we hold that section 10.2a does not bar Paul Revere from defending against Haas's claim even if the insurer may not rescind the policy.

## –B–

■ The next question is whether Paul Revere has a defense against Haas's claim for coverage for disability resulting from retinitis pigmentosa. Paul Revere initially contends that its policy does not cover Haas's condition. That contention implicates paragraph 10.2b, which prohibits denial of a claim "because a disease or physical condition existed before the Date of Issue unless it is excluded by name or specific description." Thus, the question becomes whether a concealed disease is specifically excluded under the terms of the policy.

■ Under those terms, Paul Revere agreed to pay benefits to Haas if he became totally disabled. Under the "exclusions" section, the policy further stated that Paul Revere need not "pay benefits for a pre-existing condition if it was not disclosed on your application." The policy's definition of "Total Disability" further requires that the disability be caused by a "Sickness or Injury." "Sickness" is defined as "sickness or disease which first manifests itself after the Date of issue and while Your Policy is in force." Haas's retinitis pigmentosa manifested itself as early as 1983, four years before Paul Revere issued the policy. Haas acknowledges

that his sickness does not satisfy the definition. He contends, however, that section 10.2b requires a more specific description to justify exclusion from coverage. We disagree. Because Haas concealed that he suffered from retinitis pigmentosa, Paul Revere could hardly be expected to exclude "that disease or physical condition" by a more specific description. We conclude that the definition of "sickness" operates as an "exclu[sion] by specific description."

Generally, "[i]n construing exclusionary clauses, the court is obligated to interpret such clauses strictly and in favor of coverage." *Township of Gloucester v. Maryland Casualty Co.*, 668 *F.Supp.* 394, 400 (D.N.J.1987). Moreover, "where the insurer fails to include certain exceptions in the provisions of the incontestable clause, the courts will not read them into the policy." Appleman, *supra*, § 311 at 316.

The majority rule is that the incontestability clause does not provide a basis for an insured to recover for a condition that is not covered under the policy. Most courts have held that

[w]here loss is claimed by reason of disability, it is necessary, under the average policy, that the cause of such disability arise within the policy terms and after the insurance has been effected. This is a condition of liability, a condition of the insurance.... The incontestable clause does not apply under those circumstances, and there can be no recovery unless the cause of disability arose within the time designated.

[Appleman, *supra*, § 333 at 390.]

*See, e.g., Neville v. American Republic Ins. Co.*, 912 *F.*2d 813, 815 (5th Cir.1990) (holding that under Mississippi law, incontestability clause does not extend coverage of policy to include pre-existing conditions); *Button v. Connecticut Gen. Life Ins. Co.*, 847 *F.*2d 584, 588 (9th Cir.) (allowing challenge under Arizona law to disability claim, despite incontestability clause, on grounds that policy did not cover pre-existing conditions), *cert. denied*, 488 *U.S.* 909, 109 *S.Ct.* 261, 102 *L.Ed.*2d 250 (1988); *Keaten, supra*, 648 *F.*2d at 301 (noting that Georgia follows majority rule that, after contestability period has run, insurer may not contest validity of policy itself, but "reserves the right to deny any claim if it is not

within the coverage as stated under the policy's terms"); *Forman, supra,* 516 *F.*2d at 428 (stating that under Florida law "incontestable clause in a disability policy does not deprive the insurer from defending on the ground that the particular disability was never within the policy coverage"), *cert. denied,* 424 *U.S.* 914, 96 *S.Ct.* 1114, 47 *L.Ed.*2d 319 (1976); *National Life & Accident Ins. Co. v. Mixon,* 291 *Ala.* 467, 282 *So.*2d 308, 316 (1973) (finding that disability caused by pre-existing glaucoma not covered under policy although one-year incontestability period had passed); *id.,* at 474, 282 *So.*2d at 314 (noting that majority rule allows insurer to contest on grounds that risk was never covered and listing cases); *Carlson, supra,* 222 *N.E.*2d at 371 (incontestability clause does not alter scope of coverage); *Morse, supra,* 487 *S.W.*2d at 319 ("Incontestability clause should not be applied to change the meaning of the terms of the policy or to enlarge its coverage."); *see also* cases cited in Appleman, *supra,* § 333. Some courts, however, have reached a contrary conclusion. See *Equitable Life Assurance Society v. Bell,* 818 *F.Supp.* 245, 250 (N.D.Ind.1993) (holding that, under Indiana law, "if an insured is not disabled * * * [during the contestability period], then his claim for benefits cannot be denied on the grounds that he had a pre-existing condition"); *Wischmeyer, supra,* 725 *F.Supp.* at 1001–02 (holding that under Indiana law, if insured's pre-existing disability results in claim arising after contestability period expires, insurer may not defend on basis of pre-existing disability); *Fischer v. Massachusetts Casualty Ins. Co.,* 458 *F.Supp.* 939, 944 (S.D.N.Y.1978) (holding that under New York law, policy defining covered conditions as those that first manifest themselves after coverage begins was not proper exclusion by "name or specific description" under incontestability clause); *McMackin v. Great American Reserve Insurance Co.,* 22 *Cal.App.*3d 428, 99 *Cal.Rptr.* 227, 234–35 (1971) (noting pre-existing illnesses and injuries "irrelevant" once contestability period has expired); *White v. Massachusetts Casualty Ins. Co.,* 96 *A.D.*2d 732, 465 *N.Y.S.*2d 345, 346 (1983) (following *Fischer, supra,* and holding that incontestability clause precludes exclusion of pre-existing illnesses through coverage provisions),

*appeal withdrawn,* 70 *N.Y.*2d 694, 518 *N.Y.S.*2d 1032, 512 *N.E.*2d 558 (1987).

The Law Division, following the minority rule, adopted an argument similar to that advanced by Haas. In *Lindsay v. United States Life Insurance Co.,* 80 *N.J.Super.* 465, 194 *A.*2d 31 (1963), the policy contained a statutorily-required incontestable provision similar to that in section 10.2a here. *See id.* at 467, 194 *A.*2d 31. It further defined sickness as " 'sickness . . . contracted while this policy is in force and causing loss covered by this policy commencing while this policy is in force. . . .' " *Id.* at 471, 194 *A.*2d 31 (quoting policy). The insurer argued that, because the insured's sickness was contracted before the policy was in force, it was not covered under the policy. *Ibid.*

The Law Division rejected the insurer's defense. It held that "[d]efinition of a policy term cannot be allowed to alter the effect of a 'required provision' in the uniform law. . . . The policy contains no appropriate exclusion 'by name or specific description.' The full benefit of the 'incontestable' clause must accrue to plaintiffs, unaffected by collateral provisions." *Id.* at 471, 194 *A.*2d 31. Thus, the *Lindsay* court interpreted the incontestability clause as requiring the insurer to cover pre-existing conditions. *See also Manzella v. Indianapolis Life Ins. Co.,* 814 *F.Supp.* 428, 434 (E.D.Pa.1993) (applying New Jersey law, following *Lindsay,* and holding that "once the incontestability clause has matured, no pre-existing conditions can be excluded").

We believe that *Lindsay* was wrongly decided. Contrary to the Law Division's perception in *Lindsay,* the present case is not so much an attempt by the insurer to escape from the incontestability clause by an unwarranted exclusion of a "sickness or physical condition" as it is an attempt by the insured to obtain coverage of a condition that the insurer would not have covered if the insured had not concealed its existence. " 'A provision for incontestability does not have the effect of converting a promise to pay on the happening of a stated contingency into a promise to pay whether such contingency does or does not happen.' " *Equitable Life*

*Assurance Soc'y v. Rothstein,* 122 *N.J.Eq.* 606, 609, 195 *A.* 723 (Ch.1937) (quoting *Sanders v. Jefferson Standard Life Ins. Co.,* 10 *F.*2d 143, 144 (5th Cir.1925)), *aff'd,* 123 *N.J.Eq.* 591, 199 *A.* 43 (E. & A.1938). *See* Appleman, *supra,* § 311 at 320–21 ("An incontestable clause does not ... extend the liability under the contract to any degree."). On balance, we are persuaded by the majority rule.

In short, the incontestability clause does not prevent insurers from limiting coverage of pre-existing conditions by excluding those conditions "from coverage by name or specific description." Thus, we hold that insurers properly may limit the scope of the coverage to sicknesses that "first manifest" themselves after the policy has been issued.

The Appellate Division embraced the minority view and concluded "that if defendant's disability began after the expiration of the two-year period, plaintiff may not deny coverage based on defendant's preexisting condition." 266 *N.J.Super.* at 44, 628 *A.*2d 772. We disagree with the Appellate Division in several respects.

The Appellate Division began its analysis by stating that an insurance contract should be read as an ordinary insured would understand it, particularly because insurance policies are contracts of adhesion. *Id.* at 42–43, 628 *A.*2d 772. Provision 10.2b, however, is not the result of the insurer's dominant bargaining power. Rather it results from the statutory mandate of *N.J.S.A.* 17B:26–5b, which requires the inclusion of the provision in a disability policy.

"A specific provision integrated into the contract by force of a statute, as a matter of public policy, 'must be interpreted and given effect in accordance with the intention of the legislature, irrespective of how the contractors understood it.'" *Saffore v. Atlantic Casualty Ins. Co.,* 21 *N.J.* 300, 310, 121 *A.*2d 543 (1956) (quoting 3 *Corbin on Contracts* § 551 at 200–01 (1960)); Appleman, *supra,* § 332 at 384 ("[a]n incontestability clause required by statute cannot be construed against the insurer."). The rationale

is that a statutorily-mandated clause is not included in the policy because of the insurer's superior bargaining powers.

We disagree, moreover, with the Appellate Division's belief that an ordinary insured would read the policy so that section 10.2b would render an insured invulnerable to his or her own fraud in concealing a known sickness from an insurer when applying for disability insurance. Disability insurance policies, like many other types of insurance policies, are aleatory contracts in which the insurer for a premium agrees to compensate the insured for certain risks if they occur. The premium would be vastly different if the insured could deceive the insurer into insuring against risks that had already arisen. Finally, unlike the Appellate Division, see 266 *N.J.Super.* at 44, 628 *A.*2d 772, we do not see any inconsistency between the pre-existing-condition clause and the provisions of *N.J.S.A.* 17B:26–5b, which states that no such claim "shall be ... denied on the ground that a disease or physical condition" existed before the date of issue. We doubt that the Legislature, when enacting *N.J.S.A.* 17B:26–5b, contemplated that it was authorizing insureds to conceal a known disability and then reap the benefit of their deception by recovering for the disability that was so concealed.

–C–

Paul Revere notes that section 10.2b prohibits the insurer from denying coverage for claims on the grounds that they "existed" on the date of issue. It argues that this language should be construed to prohibit defenses only when the insured was unaware of the condition. Thus, when a condition existed, but was not manifest, the insurer may not use it as a defense; but when the condition was known to the insured, the insurer may deny coverage. So read, the clause denies the benefit of the incontestability clause to insureds who, like Haas, lie on their applications.

Courts have divided on the issue of the distinction between diseases that "exist" and those that are "manifest." *Compare Forman, supra,* 516 *F.*2d at 429–30 (applying Florida law and

holding that policy protected insured only concerning claims for diseases that existed but were not manifested prior to policy date) *and Mutual Life Ins. Co. of N.Y. v. Hayden,* 87 Misc.2d 1039, 386 *N.Y.S.*2d 978, 982 (Sup.Ct.1976) (following *Forman* and allowing insurance company to deny claim "where the disease *existed and was manifested* prior to the policy's issuance"), *aff'd o.b.,* 60 *A.D.*2d 823, 401 *N.Y.S.*2d 992, *appeal dismissed,* 44 *N.Y.*2d 838, 406 *N.Y.S.*2d 758, 378 *N.E.*2d 121 (1978) *with Bell, supra,* 818 *F.Supp.* at 250 (insurer's interpretation, that incontestability language referring to "existing" conditions does not speak to situation where sickness has manifested itself, "does not give [the] clause its plain meaning"); *Fischer, supra,* 458 *F.Supp.* at 944 (noting that interpretation of clause that allows insurer to defend against existing and manifested diseases "has the effect of rendering the clause an absolute nullity") *and Monarch Life Ins. Co. v. Brown,* 125 *A.D.*2d 75, 512 *N.Y.S.*2d 99, 103 (1987) (holding that "term 'exist' as used by the Legislature subsumes the term 'manifest.' ... [T]o follow the *Forman exist-manifest* distinction renders the statutorily-mandated incontestability clause a nullity ..."). The Appellate Division followed the cases that rejected the distinction between diseases that "existed" and those that are "manifested." 266 *N.J.Super.* at 43–44, 628 *A.*2d 772. We, however, find the distinction valid.

 We believe that insurers should compensate victims to the extent "that compensation will not condone and encourage intentionally wrongful conduct." *Voorhees, supra,* 128 *N.J.* at 181, 607 *A.*2d 1255. Thus, we doubt that the Legislature intended the incontestability clause to serve as an invitation for fraudulent applications for disability insurance. In another context, we noted that "[i]nsurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates." *Merin v. Maglaki,* 126 *N.J.* 430, 436, 599 *A.*2d 1256, (1992). Indeed, the Legislature has expressed its intention to fight insurance fraud in the New Jersey Insurance Fraud Prevention Act, *N.J.S.A.* 17:33A–1 to –15.

As the act itself states, its purpose "is to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims." *N.J.S.A.* 17:33A–2. If we were to permit a dishonest insured to recover, insurers would include the cost of that risk in premiums charged to honest insureds.

Our decisions reflect similar concerns. For example, in *Massachusetts Mutual Life Insurance Co. v. Manzo*, 122 *N.J.* 104, 584 *A.*2d 190 (1991), we considered whether an applicant's misstatements "materially affected" the insurer's acceptance of the risk under *N.J.S.A.* 17B:24–3(d). That statute allows an insurer to rescind during the contestability period only when the misstatements are material. We concluded that a statement was material regardless of whether the insured lied with the intent to defraud and whether the misrepresented disability rendered the insured uninsurable or was causally related to his death. *Id.* at 113, 584 *A.*2d 190. Accordingly, we adopted a broad materiality test under which the insurer may rescind if the false concealment " 'naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.' " *Id.* at 115, 584 *A.*2d 190 (quoting *Kerpchak v. John Hancock Mut. Ins. Co.*, 97 *N.J.L.* 196, 198, 117 *A.* 836 (E. & A.1922) (alteration in original)). We noted that "[b]y denying coverage to insureds who lie, th[is] test encourages applicants to tell the truth." *Id.* at 116, 584 *A.*2d 190.

Similarly, in *Longobardi v. Chubb Insurance Co.*, 121 *N.J.* 530, 533, 582 *A.*2d 1257 (1990), we held that "when an insurance policy clearly states that material misrepresentations will void the policy, the insurer need not pay the insured for an alleged loss if the insured makes a material misrepresentation to the insurer while it is investigating the claim." We noted that post-loss misrepresen-

tations "strike at the heart of the insurer's ability to acquire the information necessary to determine its obligations and to protect itself from false claims." *Id.* at 539, 582 *A.*2d 1257.

Furthermore, when considering the right of insurers to rescind life-insurance policies because of misrepresentations in the insured's application, we have recognized that insurers ordinarily rely on the "truthfulness of the insured's rendition of his medical history." *Equitable Life Assurance Soc'y v. New Horizons, Inc.,* 28 *N.J.* 307, 312, 146 *A.*2d 466 (1958). In that same context, we have also noted the duty of the insured to disclose known facts about his or her health when the application requests that information. *Gallagher v. New England Mut. Life Ins. Co.,* 19 *N.J.* 14, 22, 114 *A.*2d 857 (1955).

Also relevant is the principle that "[o]ne cannot obtain insurance for a risk that the insured knows has already transpired." *Township of Gloucester, supra,* 668 *F.Supp.* at 403. Here, Haas knew when he applied for the policy that his retinitis pigmentosa existed and that the disease would disable him. Haas argues that his fraud is irrelevant because Paul Revere could have selected a clause that would have excluded fraudulent misstatements from the contestability period. That the Legislature provided the insurer with that option, however, does not mean that it intended to authorize recovery based on coverage obtained through false statements that would circumvent exclusions from the coverage under the policy.

We hold that the statutory language that precludes a defense based on a pre-existing disability does not protect insureds who make fraudulent misrepresentations in their applications. Rather, the language is intended to protect those insureds who are unaware of their diseases. Consequently, we believe that the dissent incorrectly characterizes the denial of coverage as a "lie" by the insurer. *Post* at 211, 644 *A.*2d at 1109. The insured remains covered under the policy except for the known disease that he intentionally concealed. To characterize as a "lie" the denial of a

claim arising out of a disease that the insured intentionally concealed is to stand the duty to tell the truth on its head.

–V–

We reverse that part of the judgment of the Appellate Division that bars Paul Revere from denying coverage on the basis of the incontestability clause. We affirm the remand to the Law Division for determination whether Haas was disabled during the contestability period.

So ordered.

O'HERN, J., concurring in part and dissenting in part.

I dissent primarily for the reasons stated by the Appellate Division in the opinion below, 266 *N.J.Super.* 35, 628 *A.*2d 772 (1993), but I add these observations. It is not easy to write an opinion upholding the rights of a liar. The majority is rightly indignant in its phrasing of the issue: "If we were to permit a dishonest insured to recover, insurers would include the cost of that risk in premiums charged to honest insureds." *Ante* at 209, 644 *A.*2d at 1107. If, however, we change the majority's statement of the question slightly, the issue becomes whether a dishonest insurance company may lie to a policyholder by making an unqualified promise that after two years the company will never contest coverage on the basis of any of the policyholder's statements, while intending all along to contest any claims on that very basis. That is what this case is about.

Because of procedural requirements, we must assume that defendant willfully concealed his medical history. If that is true, defendant is not deserving of our sympathy. But what of the next policyholder who, not having known that she had cancer at the time she purchased her health insurance despite having felt a lump in her breast, must face costly and lengthy litigation brought by her insurance company, which claims that she concealed her cancer? That occurring at a time when she most needs peace of mind.

The only reason we have incontestability clauses in insurance policies is because of widespread "charges of corruption, fraud, and dishonesty" in the insurance industry. Eric K. Fosaaen, *Aids and the Incontestability Clause,* 66 *N.D.L.Rev.* 267, 269 (1990). At the turn of the century in New York,

> the Armstrong Commission carefully probed into every aspect of the insurance industry. The Armstrong Commission uncovered many scandals within the insurance industry and unleashed a reform movement that quickly led to extensive regulation of what had largely been an unrestrained industry.
>
> The Armstrong Commission was quickly followed by other reformer-minded groups. The most important of these reform groups was a national conference of governors, attorneys general, and insurance commissioners held in Chicago in 1906. The conference formed a Committee on Uniform Legislation, known as the Committee of Fifteen. The Committee of Fifteen drafted model insurance policies which included the reform measures recommended by the Armstrong Commission. The Committee of Fifteen included the incontestability clause in the model life insurance policies it proposed. Following the Armstrong Investigation, the state of New York enacted the Standard Policy Law which required an incontestability clause in all life insurance policies sold in New York. In 1907, North Dakota adopted New York's Standard Policy of life insurance as its own.
>
> In 1946, the National Association of Insurance Commissioners (hereinafter N.A.I.C.) drafted a model incontestability clause statute based on the 1907 New York Standard Policy language. At least 47 states have adopted statutes requiring the inclusion of an incontestability clause in every policy of life insurance sold in that state. Most of these states, in enacting incontestability legislation, have adopted the model incontestability clause statute of the N.A.I.C. Thus, the form of the incontestability clause required by various state statutes is quite consistent.
>
> [*Id.* at 269–71 (footnotes omitted).]

Today, a policy providing reliable health benefits is the single most important insurance product that the public seeks. However, the escalating cost of health care is driving insurance companies to seek ways to hold down claims costs. I do not object to an insurer's frank statement to its policyholders that it will contest any and all claims on a policy should it discover that the policyholder intentionally concealed medical history. After all, ours is a free-market society; we get only what we pay for. However, I disapprove of an insurance company's attempt to avoid providing the coverage for which it has freely chosen the terms and for which it has accepted premiums. That is the case here.

Our Legislature has provided insurance companies with two types of incontestability clauses. The first allows the insurer to deny coverage any time after issuance of the policy when the insured has made "fraudulent misstatements" in the application. *N.J.S.A.* 17B:26–5(a). The other type of clause bars, after two years, *any* contest over policy statements but tolls the running of the two-year contestability period for any period during which the insured was disabled. *N.J.S.A.* 17B:26–5(a)(2). (The theory behind the latter type of clause must be that if the policyholder were seriously ill when applying for the policy, any disease would probably manifest itself in two years.) Thus, the Legislature intended that insurance companies choose one option or the other.

Presumably for marketing reasons, Paul Revere chose the incontestability clause that tolls the contestability period rather than the clause permitting the insurer to contest coverage at any time on the basis of fraudulent misrepresentations.[1] It argues that when it denies coverage for a preexisting condition, it is not using the statement to void the policy as it could under *N.J.S.A.* 17B:26–5(a), but rather is denying coverage for a claim that the policy does not cover. Of course, I agree that the presence of an incontestability clause does not increase coverage under a policy or provide coverage where it does not exist. If a policy specifically excludes coverage for cancer or diabetes, an incontestability clause does not extend coverage to include such diseases after two years. But when the coverage provisions of a policy are subsumed by the statutorily-mandated promise of incontestability regarding claims for diseases "not excluded from coverage by name or specific description," *N.J.S.A.* 17B:26–5(b), an ordinary policyholder would understand that if he or she were to become disabled once the contestability period had expired, "the carrier

---

[1] Marketing considerations have long played a part in the use of incontestability clauses. "Insurance companies initially offered the incontestability clause * * * because of public distrust of insurers and their promises to pay benefits in the future." Fosaaen, *supra,* 66 *N.D.L.Rev.* at 268. In fact, the first incontestability clause provided that the insurer would not contest a policy for any reason. *Ibid.*

[would be] barred from raising any challenge, by way of rescission or 'denial' of coverage, if the challenge [were] predicated on the insured's preexisting condition." 266 *N.J.Super.* at 43, 628 *A.*2d 772. To hold otherwise would allow insurance companies to delete the statutory requirement from the books.

In short, the Appellate Division was correct. We cannot "graft the 'except fraudulent misrepresentations' phrase upon the clause pertinent here." *Id.* at 40, 628 *A.*2d 772 (quoting *N.J.S.A.* 17B:26–5). Insurance companies cannot misrepresent the scope of coverage to policyholders. This company promised that after two years it would not attempt to deny coverage on the basis of claimed misrepresentations; it should honor its promise. The next policyholder may be entirely blameless.

The court below was also correct in holding that the clause tolling the two-year contestability period for any period during which the insured was disabled requires a factual determination of whether defendant was disabled for any period subsequent to the policy's effective date. Thus, I concur in the majority's affirmance of that part of the judgment below. I, however, would affirm the Appellate Division's judgment in its entirety.

STEIN, J., joins in this opinion.

*For reversal in part and affirmance in part*—Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—4.

*For concurrence in part and dissent in part*—Justices O'HERN and STEIN—2.